# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

SHAOMESHA SHACKELFORD,  
    Plaintiff

    vs

COMMISSIONER OF  
SOCIAL SECURITY,  
    Defendant

Case No. 1:10-cv-604  
Dlott, J.  
Litkovitz, M.J.

**REPORT AND**  
**RECOMMENDATION**

    Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application

for supplemental security income (SSI). This matter is before the Court on plaintiff's Statement

of Errors (Doc. 11), the Commissioner's response in opposition (Doc. 16), and plaintiff's reply

memorandum. (Doc. 17).

## PROCEDURAL BACKGROUND

    Plaintiff was 35 years old at the time of the administrative law judge's (ALJ) decision.

She has an eleventh grade education and past relevant work as a nurse's aid and fast-food

worker. Plaintiff filed an application for SSI in October 2004 alleging an onset date of disability

of October 31, 2003, due to asthma, heart murmur, scoliosis, and sleep apnea. (Tr. 77-79, 88).

Plaintiff's application was denied initially and upon reconsideration. Plaintiff then requested and

was granted a de novo hearing before an ALJ. On July 2, 2008, plaintiff, who was represented by

counsel, appeared and testified at a hearing before ALJ Melvin Padilla. A vocational expert (VE)

also appeared and testified at the hearing.

On September 22, 2008, the ALJ issued a decision denying plaintiff's SSI application. The ALJ determined that plaintiff suffers from the following severe impairments: residuals of a mitral valve and patent foramen ovale repair, respiratory problems due to chronic obstructive pulmonary disease/asthma with variable pulmonary function testing results, estimated borderline intellectual functioning, and a loss of vision in her right eye due to a cataract.[1]  (Tr. 22-23).  The ALJ found that plaintiff's impairments do not meet or equal the level of severity described in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 26).  According to the ALJ, plaintiff retains the residual functional capacity (RFC) to perform light work as defined in 20 C.F.R. § 416.967(b)[2] except that plaintiff should not climb ladders, scaffolds, or work at unprotected heights.  Plaintiff is precluded from performing jobs that require vision in both eyes or more than occasional stooping, kneeling, crouching, crawling, or climbing of stairs.  She is limited to performing inside work in temperature-controlled environments where she would not be exposed to noxious gasses, odors, fumes, or poorly ventilated spaces.  She is also limited to low-stress, unskilled, simple, repetitive tasks which do not involve fast-paced work, strict production quotas, interpersonal contact with members of the general public, or more than minimal interpersonal contacts with co-workers or supervisors.  (Tr. 26).  The ALJ next determined that plaintiff is unable to perform any past relevant work.  (Tr. 32).  The ALJ further determined that plaintiff is capable of performing a significant number of jobs in the national

---

[1] The ALJ noted that plaintiff has monocular vision due to a retinal detachment in her right eye and a cataract in that eye, neither of which are amenable to surgical treatment.  (Tr. 24).

[2] Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 416.967(b).  Social Security regulations provide that "a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  *Id.*

economy including jobs as an assembly machine tender, can filler and closing machine tender. (Tr. 33). Accordingly, the ALJ concluded that plaintiff is not disabled under the Act. (Tr. 33).

Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for SSI, plaintiff must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is dependent upon disability, income, and other financial resources. 20 C.F.R. § 416.202. To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than twelve months. Plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy. 20 C.F.R. § 416.905.

Regulations promulgated by the Commissioner establish a sequential evaluation process

3

for disability determinations.  20 C.F.R. § 404.1520.  First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends.  Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends.  Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded.  20 C.F.R. § 404.1520(d).  Fourth, if the individual's impairments do not meet or equal those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment.  If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform.  *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981).

The Commissioner is required to consider plaintiff's impairments in light of the Listing of Impairments.  20 C.F.R. Part 404, Subpart P, Appendix 1 (Listing).  The Listing sets forth certain impairments which are presumed to be of sufficient severity to prevent the performance of work.  20 C.F.R. § 404.1525(a).  If a plaintiff suffers from an impairment which meets or equals one set forth in the Listing, the Commissioner renders a finding of disability without consideration of plaintiff's age, education, and work experience.  20 C.F.R. § 404.1520(d); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 528 (6th Cir. 1981).

4

Plaintiff has the burden of establishing disability by a preponderance of the evidence. *Born v. Secretary of Health and Human Servs.*, 923 F.2d 1168, 1173 (6th Cir. 1990); *Bloch v. Richardson*, 438 F.2d 1181 (6th Cir. 1971).  Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999); *Born*, 923 F.2d at 1173; *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980).  To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321, 323 (6th Cir. 1978). *See also Richardson v. Secretary of Health & Human Services*, 735 F.2d 962, 964 (6th Cir. 1984)(per curiam).  Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability.  20 C.F.R. Subpart P, Appendix 2; *O'Banner*, 587 F.2d at 323. *See also Cole v. Secretary of Health and Human Services*, 820 F.2d 768, 771 (6th Cir. 1987).

A mental impairment may constitute a disability within the meaning of the Act. *See* 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A).  The sequential evaluation analyses outlined in 20 C.F.R. §§ 416.920 and 416.924 apply to the evaluation of mental impairments.  However, the regulations provide a special procedure for evaluating the severity of a mental impairment at steps two and three for an adult.  20 C.F.R. § 416.920a.  The special procedure also applies when Part A of the Listing is used for an individual under age 18. *Id.*  At step two, the ALJ must evaluate the claimant's "symptoms, signs, and laboratory findings" to determine whether the

5

claimant has a "medically determinable mental impairment(s)." *Rabbers v. Commissioner Social Sec. Admin.*, 582 F.3d 647, 653 (6th Cir. 2009) (citing 20 C.F.R. § 404.1520a(b)(1)).  If so, the ALJ "must then rate the degree of functional limitation resulting from the impairment." *Id.* (citing 20 C.F.R. § 404.1520a(c)(3)).

The claimant's level of functional limitation is rated in four functional areas, commonly known as the "B criteria":  1) activities of daily living; 2) social functioning; 3) concentration, persistence, or  pace; and 4) episodes of decompensation.  *Id.* (citing 20 C.F.R. pt. 404, Subpt. P, App. 1, § 12.00 et seq.; *Craft v. Astrue,* 539 F.3d 668, 674 (7th Cir. 2008)).  The degree of limitation in the first three functional areas is rated using the following five-point scale:  None, mild, moderate, marked, and extreme.  *Id.* (citing 20 C.F.R. § 404.1520a(c)(4)).  The degree of limitation in the fourth functional area (episodes of decompensation) is rated using a four-point scale:  None, one or two, three, four or more.  *Id.*  If the ALJ rates the first three functional areas as "none" or "mild" and the fourth area as "none," the impairment is generally not considered severe and the claimant is conclusively not disabled.  *Id.*  (citing § 404.1520a(d)(1)).  Otherwise, the impairment is considered severe and the ALJ will proceed to step three.  *Id.* (citing § 404.1520a(d)(2)).

At step three of the sequential evaluation, an ALJ must determine whether the claimant's impairment "meets or is equivalent in severity to a listed mental disorder." *Id.*  A claimant whose impairment meets the requirements of the Listing will be deemed conclusively disabled. *Id.* If the ALJ determines that the claimant has a severe mental impairment that neither meets nor medically equals a listed impairment, the ALJ will then assess the claimant's RFC before

6

completing steps four and five of the sequential evaluation process.  *Id*. (citing 20 C.F.R. § 404.1520a(d)(3)).

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight.  "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once."  *Walters v. Comm'r of Soc. Sec*., 127 F.3d 525, 529-530 (6th Cir. 1997).  *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference.").  Likewise, a treating physician's opinion is entitled to substantially greater weight than the contrary opinion of a non-examining medical advisor.  *Shelman v. Heckler,* 821 F.2d 316, 321 (6th Cir. 1987).  If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight.  20 C.F.R. § 404.1527(d)(2); *see also Blakley v. Commissioner*, 581 F.3d 399, 406 (6th Cir. 2009); *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004).  "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records."  *Barker v. Shalala*,  40 F.3d 789, 794 (6th Cir. 1994).  The Social Security regulations likewise recognize the importance of longevity of treatment, providing that treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings

alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2).

If the ALJ does not give the treating source's opinion controlling weight, then the ALJ must consider a number of factors when deciding what weight to give the treating source's opinion. 20 C.F.R. § 404.1527(d). These factors include the length, nature and extent of the treatment relationship and the frequency of examination. 20 C.F.R. § 404.1527(d)(2)(i)(ii); *Wilson*, 378 F.3d at 544. In addition, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d)(3)-(6); *Wilson*, 378 F.3d at 544. The ALJ must likewise apply the factors set forth in § 404.1527(d)(3)-(6) when considering the weight to give a medical opinion rendered by a non-treating source. 20 C.F.R. § 404.1527(d). When considering the medical specialty of a source, the ALJ must generally give "more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(d)(5).

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991).

Where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the

sequential evaluation may be continued. *DeGrande v. Secretary of H.H.S.*, 892 F.2d 1043, 1990

WL 94, at *3 (6th Cir. Jan. 2, 1990). Remand is also appropriate if the Commissioner applied an

erroneous principle of law, failed to consider certain evidence, failed to consider the combined

effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17

F.3d 171, 176 (6th Cir. 1994). Remand ordered after a hearing on the merits and in connection

with an entry of judgment does not require a finding that the Commissioner had good cause for

failure to present evidence at the prior administrative hearing. *Faucher*, 17 F.3d at 173.

Benefits may be immediately awarded "only if all essential factual issues have been

resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher,* 17

F.3d at 176. *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Secretary*

*of Health and Human Services*, 820 F.2d 777, 782 (6th Cir. 1987). The Court may award

benefits where the proof of disability is strong and opposing evidence is lacking in substance, so

that remand would merely involve the presentation of cumulative evidence, or where the proof of

disability is overwhelming. *Faucher*, 17 F.3d at 176. *See also Felisky v. Bowen*, 35 F.3d 1027,

1041 (6th Cir. 1994); *Mowery v. Heckler,* 771 F.2d 966, 973 (6th Cir. 1985).

## MEDICAL EVIDENCE

### A.     Plaintiff's physical impairments

On December 3, 2003, plaintiff was seen in the emergency department due to an acute

asthma exacerbation. (Tr. 167-168). On December 18, 2003, plaintiff was again seen in the

emergency department due to an asthma exacerbation. (Tr. 172-173). She was admitted so

doctors could continue Albuterol Nebulizer treatments. (Tr. 173). Plaintiff was discharged from

the hospital on December 21, 2003. (Tr. 180).

On January 16, 2004, a chest x-ray showed suggestion of right lower lobe infiltrate. (Tr. 252).

The record contains numerous treatment notes from Middletown Family Practice, beginning in January 2004, where plaintiff was treated primarily by Dr. Kaiser and Dr. Kirila. (Tr. 288-310, 572-614). In an office note dated January 22, 2004, Dr. Kaiser noted decreased breath sounds and increased respiratory effort on physical examination of the lungs. (Tr. 306).

On February 16, 2004, a transthoracic echocardiogram procedure report revealed 1+ mitral insufficiency, 1+ pulmonic insufficiency, 1/2+ tricuspid insufficiency, and probable atrial septal defect[3] or patent foramen ovale.[4] (Tr. 249-250). An exercise stress test procedure report dated February 23, 2004 was negative for exercise induced ischemia. (Tr. 225).

A scoliosis survey report dated March 1, 2004 showed right thoracolumbar scoliosis with a scoliosis angle between superior margin of T3 and superior margin of L1 of 26. (Tr. 254).

On March 11, 2004, Dr. Kirila completed a request for medical information at the request of the Butler County Department of Job and Family Services. (Tr. 256). Dr. Kirila indicated that plaintiff was unable work due to heart disease, asthma, scoliosis, sleep apnea, vision loss in right eye, and anemia. *Id.*

On March 23, 2004, plaintiff attended a physical evaluation with Martin Fritzhand, M.D., at the request of the state agency. (Tr. 184-186). On physical examination, Dr. Fritzhand reported that plaintiff's visual acuity with corrected lenses was poorer than 20/200 on the right

---

[3]An atrial septal defect (ASD) is a hole in the septum between the heart's two upper chambers. *See* http://www.nhlbi.nih.gov/health/dci/Diseases/holes/holes_whatare.html.

[4]A patent foramen ovale (PFO) is a hole in the heart that does not close the way it should after birth. *See* http://www.mayoclinic.com/health/patent-foramen-ovale/DS00728.

and 20/30 on the left. (Tr. 185). Dr. Fritzhand also reported a depressed left Achilles tendon reflex which was graded 1+/4+. *Id.* Dr. Fritzhand noted right dorsal scoliosis. *Id.* He indicated straight leg raising was diminished to 70 degrees bilaterally. (Tr. 185-186). Dr. Fritzhand noted that plaintiff was of short stature, standing 4 feet 8 inches tall. (Tr. 185). Dr. Fritzhand indicated he was unable to assess functional capacity without concomitant pulmonary function study. (Tr. 186).

On March 23, 2004, a chest x-ray showed right convex scoliosis of dorsal spine of 32 degrees and borderline normal heart size. (Tr. 191).

A pulmonary function study report from April 7, 2004 showed at least a moderate obstructive ventilary defect with significant improvement after bronchodilator therapy. (Tr. 257-258). The report showed evidence of moderate air trapping. *Id.* The report also showed the flow volume loop was obstructive in configuration. *Id.*

A May 4, 2004 pulmonary function study revealed moderate chronic obstructive pulmonary disease with a large bronchospastic component. (Tr. 196-202).

On July 30, 2004, a chest x-ray indicated moderate to marked scoliosis in the thoracic spine, convexity of which was to the right and compensatory scoliotic curve in the upper lumbar spine to the left. (Tr. 261).

On October 6, 2004, Charles Whalen, M.D., completed a basic medical form at the request of the Butler County Department of Job and Family Services. (Tr. 272-273). Dr. Whalen found that plaintiff could stand/walk for a total 1-2 hours in an 8 hour workday and could stand/walk for one half hour at a time without interruption. (Tr. 273). Dr. Whalen further opined that plaintiff could sit for 4 hours total in an 8 hour workday and could sit for one half hour at a

11

time without interruption. *Id*. Dr. Whalen further found that plaintiff could lift/carry up to 5 pounds frequently and 10 pounds occasionally. *Id*. Dr. Whalen also indicated that plaintiff had marked limitations with respect to pushing/pulling, bending, reaching, and handling. *Id*. Dr. Whalen indicated that plaintiff was unemployable for a period of 12 months or more. *Id*.

On October 11, 2004, plaintiff was seen in the emergency department due to acute bronchospasm/exacerbation of asthma. (Tr. 279-280). Plaintiff was given Prednisone, as well as Xopenex and Atrovent breathing treatments. (Tr. 280). She was released and advised to follow-up with Dr. Kaiser. *Id*.

On October 22, 2004, Dr. Kirila completed a request for medical information form at the request of the Butler County Department of Job and Family Services. (Tr. 297). Dr. Kirila stated that plaintiff was unable to work or complete classroom work due to chest pain, mitral valve prolapse, headaches, asthma, dizziness, iron deficiency and anemia. *Id*.

In an office note dated December 7, 2004, Dr. Kaiser noted scattered wheezing throughout bilaterally upon physical examination of the lungs. (Tr. 292).

On January 26, 2005, plaintiff's family physician, Dr. Kaiser completed a form at the request of the state agency. (287-289). Dr. Kaiser indicated that plaintiff should avoid excessive standing/walking for over one hour at a time and should not lift/carry greater than 15 pounds. (Tr. 289).

In February 2005, state agency physician Walter Holbrook, M.D., reviewed the file and assessed that plaintiff could lift and/or carry and push and/or pull up to 20 pounds occasionally, and ten pounds frequently; could stand and/or walk about six hours in an eight-hour workday; could sit about six hours in an eight-hour workday; and could only occasionally climb

ramps and stairs, stoop, kneel, crouch and crawl. (Tr. 333-40).

Plaintiff was hospitalized from February 26, 2005 to February 28, 2005 for treatment of left lower lobe pneumonia. (Tr. 341-346).

On March 21, 2005, plaintiff was seen in the emergency department due to left-sided chest pain that was likely thought to be secondary to recent pneumonia, possible parapneumonic effusion and pleuritic reaction. (Tr. 347-349).

On March 16, 2005, a CT of the chest showed moderately large left pleural effusion and left lower lobe collapse. (Tr. 350).

On March 23, 2005, plaintiff underwent treatment, including a thoracentesis, for excess fluid around her lungs, which was causing shortness of breath. (Tr. 354-60).

Plaintiff was seen in the emergency department on March 29, 2005 due to difficulty breathing. (Tr. 358-359). The emergency room physician stated that plaintiff's difficulty breathing was caused by irritation from a recent thoracentesis that was done to drain a pleural effusion. *Id*.

Plaintiff returned to the emergency department on April 6, 2005 due to left rib pain, left back pain, and pain with inspiration. (Tr. 367-369). The emergency room physician indicated that plaintiff's left sided chest wall pain appeared to be chronic and musculoskeletal in nature. (Tr. 368). The physician noted that plaintiff ran out of her prescription Vicodin, which he suspected was the reason her pain had increased. *Id*.

A transthoracic echocardiogram procedure report dated April 15, 2005 showed relatively low grade mitral, aortic, tricuspid and pulmonic insufficiency and atrial septal aneurism which raised the question of possible atrial septal defect. (Tr. 381-382).

On December 17, 2005, plaintiff was seen in the emergency department due to shortness of breath. (Tr. 468-469). The discharge diagnoses were acute exacerbation of chronic obstructive pulmonary disease and upper respiratory infection. (Tr. 469).

On December 24, 2005, state agency physician Jerry McCloud, M.D., reviewed the file and affirmed state agency physician Dr. Holbrook's assessment that Ms. Shackelford could lift and/or carry and push and/or pull up to 20 pounds occasionally, and ten pounds frequently; could stand and/or walk about six hours in an eight-hour workday; could sit about six hours in an eight-hour workday; and could only occasionally climb ramps and stairs, stoop, kneel, crouch and crawl. (Tr. 333-40).

On January 11, 2006, plaintiff was seen at the emergency department due to chest wall pain. (Tr. 473-474). She was prescribed Ibuprofen and advised to follow up with her primary care doctor. (Tr. 473).

On February 18, 2006, plaintiff was seen in the emergency department for treatment of an upper respiratory infection, asthma, asthmatic bronchitis, and viral syndrome. (Tr. 479-480).

A chest x-ray dated March 5, 2006 showed prominence convex dextroscoliosis of the lower thoracic spine, unchanged when compared to a study dated January 11, 2006. (Tr. 46).

Plaintiff was seen by opthamologist Gary Varley, M.D., on March 15, 2006. (Tr. 534). Plaintiff reported having difficulty driving, especially at night and on bright, sunny days. (Tr. 534). Dr. Varley noted an untreated detached retina in her right eye, leaving her with poor vision on that side, and a cataract in her left eye. (Tr. 534). Dr. Varley recommended against any surgery. (Tr. 534).

14

A chest x-ray dated April 24, 2006 showed prominent dextroscoliosis of the mid to lower thoracic lumbar spine with secondary deformity of the chest wall. (Tr. 430). A lab report dated April 24, 2006 showed that plaintiff's iron level was low at 20 UG/DL. (Tr. 516).

On May 1, 2006, a pulmonary function study report showed no significant restrictive or obstructive ventilator defect. (Tr. 429). Plaintiff was seen again in the emergency room on May 5, 2006, due to upper back pain and upper respiratory infection. (Tr. 482-485). Plaintiff returned to the emergency department on May 8, 2006 for an acute exacerbation of asthma. (Tr. 491-92).

An echocardiogram report dated August 16, 2006 showed atrial septum aneurysm with evidence of transseptal flow consistent with the patent foramen ovale or possibly a small atrial septal defect. (Tr. 434-435).

In an office note dated September 27, 2006, Dr. Solomito, plaintiff's cardiologist, reported that he planned to proceed with heart catheterization to try and resolve the significance of the septal defect, which he noted could be the cause of plaintiff's ongoing shortness of breath. (Tr. 462-464). Dr. Solomito also noted that plaintiff had significant migraine headaches and there had been an association reported between migraines and atrial septal defects as a result of paradoxical flow of sympathomimetic amines. (Tr. 464).

A cardiac catheterization report dated October 5, 2006 showed atrial septal defect measuring 11.7 mm with 1.43 L per minute left to right shunt and a pulmonary to systemic flow ratio of 1.39. (Tr. 436-438).

A transesophageal echocardiogram report dated November 9, 2006 showed: atrial septum aneurysm with what was probably a patent foramen ovale and right to left shunting confirmed

15

with agitated saline contrast injection; 1+ mitral insufficiency; 2-3+ tricuspid insufficiency; and 1-2+ aortic insufficiency. (Tr. 439-441).

On January 30, 2007, Dr. Kirila completed a form at the request of the Butler County Department of Job and Family Services. (Tr. 442). Dr. Kirila reported plaintiff's diagnoses as asthma, lower back pain, chronic obstructive pulmonary disease (COPD), gastroesophageal reflux disease, and anemia. (Tr. 442). He again opined that plaintiff was unable to do sedentary, classroom, or any other work at the present time, and estimated that she could return to work or school in February 2008. (Tr. 442).

A medical imaging report dated February 6, 2007 showed large secundum ASD with left-to-right shunting measuring 1.6 x 1.6 cm. (Tr. 524-525).

On June 15, 2007, Dr. Kirila completed a form at the request of the Butler County Department of Jobs and Family Services wherein he found that plaintiff was unable to perform sedentary work. (Tr. 582). He estimated that plaintiff may be able to return to work on February 5, 2008. *Id*.

In an office note dated July 26, 2007, John Miller, M.D., noted that cardiac testing revealed an atrial septal defect (ASD), which he stated was a plausible explanation for her profound dyspnea. (Tr. 644). Dr. Miller recommended Ms. Shackelford undergo surgical repair of the ASD. *Id*.

On August 24, 2007, plaintiff underwent cardiac surgery to close the patent foramen ovale. (Tr. 546-548). She was seen for follow-up for the first time at the end of October 2007. (Tr. 456). She still complained of shortness of breath, and was uncertain whether she had seen any improvement. (Tr. 456).

An echocardiogram report dated November 5, 2007 showed 1+ mitral insufficiency, 1+ aortic insufficiency, 1+ pulmonic insufficiency, and 3+ tricuspid insufficiency with right atrial dilation but normal RVSP. (Tr. 651). The report indicated there was probably no significant change when compared to the previous study dated August 2005. *Id.*

An exercise stress echo report dated April 10, 2008 showed 1 to 2+ mitral insufficiency, at least 3+ tricuspid insufficiency with RVSP 1+ aortic insufficiency, persistent small shunt at the atrial septum, and poor exercise capacity with oxygen desaturation at low levels of exercise. (Tr. 645).

On April 11, 2008, plaintiff was seen in the emergency room due to bronchitis and sinusitis. (Tr. 624-625).

A pulmonary function study dated April 15, 2008 showed somewhat suboptimal effort but what appeared to be at least a mild to moderate obstructive ventilator defect with a significant improvement after bronchodilator therapy and evidence of air trapping. (Tr. 619-620).

On May 8, 2008, Ms. Shackelford was seen in the emergency room due to acute bronchitis and COPD exacerbation. (Tr. 615-617).

In May 2008, plaintiff sought emergency room treatment for congestion. (Tr. 615). She was diagnosed with bronchitis and a COPD exacerbation. (Tr. 616). She "was given breathing treatment despite the lack of bronchospasm," and was also given prednisone. "[O]utpatient followup" was emphasized. (Tr. 616).

### B.     Plaintiff's mental impairments

On May 3, 2004, plaintiff attended a psychological consultative evaluation with Deborah Southerland, Ph.D., at the request of the state agency. (Tr. 192-195). Dr. Southerland stated that

17

plaintiff was not knowledgeable of the current or past president nor any state or local government officials. (Tr. 193). Dr. Southerland indicated plaintiff could recall 1 of 23 segments of a logical memory story. *Id.* Plaintiff could recall 4 digits forward and 3 digits in reverse order. *Id.* She was unable to determine to how much change she would receive 37 cents out of a dollar. (Tr. 194). Dr. Southerland indicated that plaintiff's cognitive functioning was in the borderline range. *Id.* Dr. Southerland diagnosed Mood Disorder NOS and estimated Borderline Intellectual functioning. *Id.* She assigned a current GAF score 60.[5] *Id.* Dr. Southerland indicated that plaintiff's ability to maintain her attention and concentration and to persist on task is moderately impaired. (Tr. 194-195). Dr. Southerland indicated her ability to display appropriate work habits such as punctuality and attendance was moderately impaired. (Tr. 195). Dr. Southerland stated that plaintiff's ability to get along with peers and supervisors was moderately impaired. *Id.*

On January 25, 2005, plaintiff was seen by David Chiappone, Ph.D., for a consultative evaluation at the request of the state agency. (Tr. 311-313). Dr. Chiappone noted plaintiff's motor behavior was somewhat awkward and that she walked slowly. (Tr. 315). He indicated her speech was slow paced and average volume. *Id.* Dr. Chiappone stated that plaintiff came across as being unsure of herself, immature, and dependent. *Id.* Dr. Chiappone stated that plaintiff came across as being depressed and a bit anxious. *Id.* Her concentration, attention and memory

---

[5]A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." (*Id.*). The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). (*Id.*) at 34 . The DSM-IV categorizes individuals with scores of 41 to 50 as having "serious" symptoms. *See* DSM-IV at 32. Individuals with scores of 51-60 are classified as having "moderate" symptoms. (*Id.*). The next higher category, for scores of 61 to 70, refers to an individual with "some mild" symptoms who is "generally functioning pretty well." (*Id.*).

were reduced. *Id*. She did not appear to be malingering and further noted that plaintiff's intellect was in the borderline range. *Id*. On mental status exam, Dr. Chiappone indicated plaintiff remembered 2 of 3 objects with interference and 0 of 3 objects with 5 minute delay. *Id*. He noted she made one error on a Serial 3 addition task, a task she completed slowly. *Id*. Dr. Chiappone indicated that plaintiff remembered 4 digits forward and 3 backward. *Id*. Dr. Chiappone diagnosed Depression, Borderline Intellectual Functioning, and Personality Disorder NOS. (Tr. 314). He assigned a GAF score of 55 and indicated that plaintiff was mildly to possibly moderately impaired in her ability to remember simple 1 and 2 step job instructions. *Id*. He indicated she was moderately impaired in her ability to carry out and persist over time due to depression. *Id*. Dr. Chiappone stated she had moderately reduced stress tolerance. *Id*.

In February 2005, state agency psychologist Carl Tishler, Ph.D., reviewed the file and opined that plaintiff could complete simple tasks and follow simple instructions, and was capable of low stress, routine work. (Tr. 317).

In October 2005, plaintiff sought counseling treatment at Butler Behavioral Health Services. (Tr. 640-42). She was observed to be "expressive," "calm," with a good rapport and logical thought content. (Tr. 641). She was diagnosed with bipolar disorder, and assigned a current GAF score of 60, with an estimated high of 80 in the past year. (Tr. 642).

On November 16, 2005, Adrienne Swift, Ph.D., completed a mental functional capacity assessment form at the request of the Butler County Department of Job and Family Services. (Tr. 413-414). Dr. Swift reported that plaintiff repeated up to 5 digits forward and up to 3 digits backwards but needed instructions repeated for the digits backward section of testing. (Tr. 414).

19

Plaintiff was able to recall 2-3 words after interference and delay on a short term memory test. *Id*.

In December 2005, state agency psychologist Deryck Richardson, Ph.D., reviewed the file and affirmed state agency psychologist Dr. Tishler's assessment that plaintiff could complete simple tasks and follow simple instructions, and was capable of low stress, routine work. (Tr. 317).

On February 8, 2006, plaintiff attended a psychiatric diagnostic evaluation at Butler Behavioral Health Services. (Tr. 632-635). The psychiatrist diagnosed Major Depression, single episode, mild to moderate and dysthymia. (Tr. 635).

Between June 2006 and October 2007, plaintiff saw Community Behavioral Health counselor Greg Corban, MRC, LICDC, for ten-minute sessions eleven times. (Tr. 445-55). Mr. Corban noted general topics of discussion, but did not note any symptoms or proffer any opinions on plaintiff's mental functional capacity. (Tr. 445-55).

On August 8, 2007, plaintiff was seen by Catherine Staskavich, Ph.D., for a psychological evaluation at the request of the Butler County Department of Jobs and Family Services. (Tr. 443-444). Dr. Staskavich reported that plaintiff's primary emotional support had been her father, who died a year prior to her evaluation. (Tr. 444). Dr. Staskavich diagnosed Depressive Disorder NOS and stated plaintiff would not be employable for at least a year. *Id*.

### PLAINTIFF'S TESTIMONY AT THE HEARING

Plaintiff testified that she could not work because of constant pain in her back, chest problems that affected her breathing, and asthma flare-ups. (Tr. 664-65, 668). Plaintiff stated that she experienced flare-ups "[m]aybe four times a day or more," and perhaps every two weeks

experienced a flare-up severe enough that she would have to visit her doctor or seek emergency room treatment. (Tr. 665). Flare-ups would occur when she was cooking because of the fumes and the temperature. (Tr. 667). She also experienced chest pain several times a day. (Tr. 669). Plaintiff testified further that she saw black dots and "flutters of light" from her left eye. (Tr. 677).

Plaintiff estimated that she could lift five pounds and could walk for five minutes, stand for ten or fifteen minutes, and sit for five minutes before needing a break. (Tr. 670). She felt most comfortable lying down with her head elevated. (Tr. 670-71). Plaintiff stated that she was divorced and lived with her teenage daughters. (Tr. 661). She explained that she cooked for herself and her children, washed dishes, swept and mopped, did laundry and went to the grocery store. (Tr. 671-72). She visited other family members periodically, talked with people on the telephone, and "[o]nce in a while" someone would visit her. (Tr. 672). Plaintiff stated that she watched television, but had no hobbies, did not exercise, and had not drank any alcohol in three or four years. (Tr. 673).

## OPINION

Plaintiff assigns three errors in this case: (1) the ALJ erred in weighing the medical opinions; (2) the ALJ erred in assessing plaintiff's credibility; and 3) the ALJ's hypothetical question to the vocational expert did not accurately portray plaintiff's impairments. For the reasons that follow, the Court finds the decision of the ALJ is not supported by substantial evidence and should be reversed and remanded for further proceedings.

21

## I. The ALJ erred in weighing the medical evidence

Plaintiff contends the ALJ erred in failing to afford controlling or substantial weight to the opinions of plaintiff's treating family physician, Dr. Kirila. Plaintiff further contends that the ALJ's RFC finding improperly relied on the most recent assessments by the non-examining state agency physicians. Plaintiff also contends that the ALJ improperly evaluated the opinion of Ms. Staskavich, a therapist who provided a mental functional capacity assessment. Each assertion will be addressed in turn.

### A. Weight to Dr. Kirila's opinions

On March 11, 2004, October 22, 2004, and February 5, 2007, Dr. Kirila completed physical functional capacity assessments at the request of the Butler County Department of Job and Family Services and concluded that plaintiff is not capable of performing even sedentary work. (Tr. 256, 297, 442). The ALJ found that in each instance Dr. Kirila provided no objective basis for his conclusion that plaintiff is unable to work. The ALJ further noted that Dr. Kirila's assessments "appear to be based upon uncritical acceptance of the patient's subjective complaints, including her allegations of asthma/chronic obstructive pulmonary disease and chest pain." (Tr. 27). The ALJ noted that plaintiff has a "history of some respiratory deficits and a noticeable cardiac history," but found that "the objective spirometric and cardiac testing of record shows that she has for the most part only mild respiratory deficits and that her level of cardiac output has been consistent with the ability to perform at least light level work at all times relevant to this case." *Id.* Thus, the ALJ concluded that Dr. Kirila's assessments "cannot be given significant weight." Instead, the ALJ afforded "more weight to the assessments of the most recent BDD [state agency] reviewing physicians of record and the objective

22

electrodiagnostic testing of record." *Id.* For the reasons that follow, the Court finds the ALJ erred in weighing he treating physician's opinions in this case.

"The ALJ 'must' give a treating source opinion controlling weight if the treating source opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with the other substantial evidence in [the] case record.'" *Blakley v. Commissioner Of Social Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Wilson*, 378 F.3d at 544). A finding by the ALJ that a treating physician's opinion is not consistent with the other substantial evidence in the case record "means only that the opinion is not entitled to 'controlling weight,' *not that the opinion should be rejected*." Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *4 (emphasis added). "Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408. These factors include the length, nature and extent of the treatment relationship and the frequency of examination. 20 C.F.R. § 404.1527(d)(2)(i)(ii); 416.927(d)(2)(i)(ii); *Wilson*, 378 F.3d at 544. In addition, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(d)(3)-(6), 416.927(d)(3)-(6); *Wilson*, 378 F.3d at 544.

The ALJ's decision does not reflect an analysis of these factors. The ALJ declined to give controlling or significant weight to Dr. Kirila's assessments because the assessment forms themselves do not reflect an "objective basis" for Dr. Kirila's conclusions that plaintiff is unable to perform sedentary work. (Tr. 27). The County agency "Request for Medical Information" forms are designed to elicit minimal information from the responding physician. The forms ask

for a diagnosis, but do not request a function-by-function assessment of plaintiff's abilities or information about the clinical or objective findings to support the assessments.[6] (Tr. 256, 297, 442). Although Dr. Kirila did not state his "objective" findings within the body of the forms, the record in this case contains numerous progress notes from Middletown Family Practice where plaintiff was treated by both Dr. Kirila and Dr. Kaiser from January 2004 though January 2008 and which document the treating physicians' clinical examinations, tests, referrals, and treatment of plaintiff. (Tr. 287-310, 572-614). The record also contains reports and test results from plaintiff's treating cardiologists and pulmonary specialists to whom plaintiff was referred by Drs. Kirila and Kaiser and who kept the treating family physicians apprised of plaintiff's progress. The ALJ makes no mention of the progress notes from Dr. Kirila's practice or the other reports Dr. Kirila had at his disposal in rendering his opinion. In this regard, Dr. Kirila had the benefit of a more than four year treatment relationship with plaintiff for her cardiac, respiratory, and other impairments, including the benefit of assessing the efficacy of various treatment modalities over time from plaintiff's treating specialists. It is well established that more weight is generally given to a treating physician's opinion because "a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).[7]

---

[6]It is unclear why Dr. Kirila was not asked to give a function-by-function assessment via a more detailed form as is routinely seen in Social Security cases.

[7]The Social Security regulations likewise recognize the importance of longevity of treatment, providing that treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2).

24

Rather than recognize the lengthy treatment history that plaintiff had with Dr. Kirila, as well as the information he possessed from plaintiff's treating specialists, the ALJ minimized the medical findings and drew his own "medical" conclusions from this underlying evidence in an effort to discount Dr. Kirila's opinions.

In rejecting Dr. Kirila's assessments, the ALJ stated that objective testing shows plaintiff has "for the most part only mild respiratory deficits and that her level of cardiac output has been consistent with the ability to perform at least light level work at all times relevant to this case." (Tr. 27). While the ALJ characterized plaintiff's pulmonary testing as showing only mild deficits, the majority of the tests showed moderate obstructive ventilatory defects. An April 2004 pulmonary function study showed "at least a moderate obstructive ventilatory defect" and evidence of moderate air trapping. (Tr. 258). A pulmonary function study in May 2004 showed "moderate chronic obstructive pulmonary disease with a large bronchospastic component." (Tr. 202). There was no evidence plaintiff did not put forth maximal effort or cooperation in conjunction with this test. (Tr. 201). Plaintiff exhibited normal pulmonary function when tested in May 2006. (Tr. 429). However, plaintiff's most recent pulmonary function test administered in April 2008, which indicated the "testing was performed with fairly good effort," showed an FEV1 "severely reduced at only .92 liters which is 46% of predicted." (Tr. 619). Dr. Moore assessed "at least a mild to moderate obstructive ventilatory defect" with "evidence of air trapping," although "effort appear[ed] to be somewhat suboptimal."[8] (Tr. 619). Testing also

---

[8]Pulmonary function tests are used to diagnose chronic obstructive pulmonary disease, in assessing its severity, and in following its progress. *See* The Merck Manual (17th ed. 1999), p. 575. Vital capacity is the volume of air that can be exhaled after a maximum inspiration. The forced vital capacity, or FVC, is the vital capacity performed with expiration as forceful and rapid as possible; the one second forced volume, or FEV1, is the capacity test which measures the amount of air expended in one second. *Combs v. Office of Workers' Comp.*, 752 F.2d 203, 205 (6th Cir. 1985) (J. Martin, dissenting). The FEV1 and the FEV1/FVC fall progressively as the severity of

revealed "flow volume loop is obstructive in configuration compared to prior study" and "FEV1 has fallen significantly from 1.83 liters to 0.92 liters."[9] *Id*. Substantial evidence does not support the ALJ's finding of only mild respiratory deficits.

The ALJ also found no evidence that plaintiff's dyspnea can be linked to her cardiac history (Tr. 27), yet treatment notes from Dr. Solomito (plaintiff's cardiologist) and Dr. Miller (plaintiff's cardiac surgeon) indicate that plaintiff's atrial septal defect provided a plausible explanation for plaintiff's profound dyspnea. (Tr. 644; *see also* Tr. 462, 563). Additionally, an echocardiogram performed after plaintiff's cardiac surgery in November 2007 showed no significant change compared to pre-surgery testing. (Tr. 651). Exercise stress echo testing performed post-surgery also showed a persistent small shunt at the atrial septum and poor exercise capacity with oxygen desaturation at low levels of exercise (Tr. 645), supporting the connection between plaintiff's cardiac impairment and persistent shortness of breath despite the atrial septal defect repair. (Tr. 646). The ALJ, however, never acknowledged this evidence or the impact thereof in assessing either plaintiff's RFC or the weight to afford plaintiff's treating physician.[10] Thus, contrary to the ALJ's finding of mild symptoms, such results are indicative of moderate respiratory problems.

---

chronic obstructive pulmonary disease increases. *See* The Merck Manual (17th ed. 1999), p. 575.

[9]An individual less than 60 inches tall, meets or equals Listing 3.02 (Chronic pulmonary insufficiency) if testing reveals an FEV1 value of 1.05 liters or less. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 3.02 (A). The record indicates that plaintiff is 58 inches tall. (Tr. 570).

[10]The Commissioner argues that any failure on the part of the ALJ was harmless error because substantial evidence exists from plaintiff's alleged onset of October 2003 through December 2005, the last state agency RFC assessment upon which the ALJ relied, to support the ALJ's findings that plaintiff's pulmonary and cardiac impairments did not preclude light work activity. (Doc. 16 at 13). To accept this argument would allow the ALJ to ignore the more than two years' worth of post-December 2005 evidence when the ALJ is required to consider all the evidence of record in assessing a claimant's RFC. *See* 20 C.F.R. § 404.1545(a)(3). While the Commissioner's argument may be one in favor of a later onset date of disability, it does not support the ALJ's failure in this case.

With respect to plaintiff's cardiac impairment, the ALJ found that despite plaintiff's "notable cardiac history, including surgery in August 2007," her level of cardiac output has been consistent with the ability to perform light work. (Tr. 27). In reaching this conclusion, the ALJ interpreted the results from plaintiff's 2004 exercise stress test by citing to a medical text that was not part of the record. (Tr. 23). The ALJ noted that plaintiff's stress test revealed that she achieved a level of 7 METS, which in the ALJ's opinion is indicative of an ability to perform heavy work according to *Principles of Ambulatory Medicine*, 2d Ed., Williams and Wilkins, 1986 at 708. (Tr. 23). Yet, it is unclear whether reliance on METS findings alone is sufficient to assess an individual's physical capacity based on a cardiac impairment. The ALJ is not a medical expert and may not go "outside the record to medical textbooks for the purpose of making his own exploration and assessment as to claimant's physical condition." *Donathan v. Astrue*, 264 F. App'x 556, 561 (9th Cir. 2008) (quoting *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975)). *See also Bledsoe v. Commissioner of Social Sec.*, No. 1:09-cv-564, 2011 WL 549861, at * 7 (S.D. Ohio Feb. 8, 2011) (Barrett, J.) (ALJ not permitted to substitute own medical judgment for that of a treating physician or to make own independent medical findings)(and cases cited therein). It is undisputed that the ALJ did not have a medical expert at the hearing to assist in understanding the medical significance of the stress test administered to plaintiff. While an ALJ is free to resolve issues of credibility as to lay testimony, or to choose between properly submitted medical opinions, he is not permitted to make his own evaluation of the medical findings. *Id. See also Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (citing with approval *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) (stating "ALJs must not succumb to the temptation to play doctor and make their own independent findings")). The ALJ

27

erred in relying on his own impermissible medical fact-finding outside the record to conclude that Dr. Kirila's assessments were not consistent with the evidence of record.

Finally, the ALJ stated he was "compelled" to give more weight to the state agency doctors given his rejection of Dr. Kirila's assessments. (Tr. 27). The ALJ found that the assessments of non-examining state agency reviewing physicians Drs. Holbrook and McCloud were entitled deference because they were consistent with the evidence of record. (Tr. 26, 27).

Although the opinion of a state agency consultant "may be entitled to greater weight than a treating source medical opinion if the State agency . . . consultant's opinion is based on a review of a complete case record," Social Security Ruling 96–6p, such is not the case here. The state agency physicians rendered their opinions in February and December 2005 respectively. These doctors did not review the medical evidence from 2006, 2007, and 2008 demonstrating plaintiff's atrial septum defect and attempted surgical repair thereof, as well as evidence relating to plaintiff's more recent pulmonary function testing, chest x-rays, and emergency room visits. Therefore, these non-examining opinions were not based on a complete record and do not provide substantial evidence for rejecting the treating physician's opinions or for the ALJ's RFC opinion. *See Blakely*, 581 F.3d at 409 (ALJ may rely on non-examining source opinion over treating source opinion only when non-examining source bases the assessment on a review of the complete medical record). *See also Shelman*, 821 F.2d at 321; *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985).

The ALJ's reasons for affording no weight to Dr. Kirila's assessments lack substantial support in the record. Accordingly, plaintiff's assignment of error should be sustained.

**B.  Weight to the opinion of Catherine Staskavich, Ph.D.**

Plaintiff also contends that the ALJ erred in evaluating Dr. Staskavich's August 2007

assessment of plaintiff's functional limitations relating to her mental impairments.  The

undersigned agrees.

Dr. Staskavich, a psychologist at The Counseling Source, examined plaintiff on August 8,

2007 at the request of the Ohio Department of Job and Family Services.  (Tr. 443-44).  Dr.

Staskavich indicated that plaintiff's speech was of a normal rate, her mood was depressed, and

her insight and judgment were fair.  (Tr. 444).  Dr. Staskavich noted the following depressive

symptoms:  feelings of worthlessness, difficultly concentrating, tearfulness, irritability,

withdrawal, and suicidal ideation.  Dr. Staskavich further indicated that plaintiff was in

counseling and consulted with a psychiatrist.  However, she noted that "medication is not

effectively targeting [her symptoms]."  (Tr. 444).  Dr. Staskavich also noted that plaintiff has

COPD and will soon be undergoing heart surgery.  Dr. Staskavich diagnosed depressive disorder,

NOS and concluded that plaintiff was "unemployable" and was expected to remain so for twelve

months or more.  (Tr. 443-44).  She also opined that plaintiff was extremely limited in four areas

of work-related mental functioning and markedly limited in five additional areas.  (Tr. 443).

The ALJ afforded "minimal weight" to Dr. Staskavich's assessment.  (Tr. 30).  In

evaluating her assessment, the ALJ erroneously found that Dr. Staskavich was a therapist, not a

licensed psychologist, and therefore was not an acceptable medical source.[11]  (Tr. 30).  The ALJ

further found that Dr. Staskavich's "rationale is based upon a discussion of plaintiff's physical

limitations, an area in which Ms. Staskavich has no expertise whatsoever."  (Tr. 30).  This

---

[11]The Commissioner agrees that the Dr. Staskavich is a licensed psychologist.  (Doc. 16 at 8-9, 15).

29

finding by the ALJ is also factually erroneous.  One sentence of Dr. Staskavich's narrative report indicates that "plaintiff has COPD, upcoming open heart surgery (8/07)."  There is no indication from the report that Dr. Staskavich "based her rationale" on such information as found by the ALJ.  To the contrary, Dr. Staskavich's narrative report clearly indicates that she considered plaintiff's psychologically-based symptoms in her assessment of plaintiff's functional capacity. (Tr. 444).  Accordingly, the reasons given by the ALJ in weighing Dr. Staskavich's findings are not supported by substantial evidence.

Nevertheless, the Commissioner argues that the ALJ's decision in this regard was reasonable because Dr. Staskavich only examined plaintiff on one occasion, rendered her opinion only days before plaintiff's scheduled heart surgery, provided no objective basis for her extreme opinion, and proffered an opinion on an ultimate issue reserved to the Commissioner.  (Doc. 16 at 15).  These assertions are not well-taken.

In assessing plaintiff's mental limitations, the ALJ gave significant weight to the assessments of Dr. Southerland and Dr. Chiappone, consultative psychologists who, like Dr. Staskavich, also examined plaintiff on only one occasion.  Therefore, the one-time nature of Dr. Staskavich's evaluation does not provide a reasonable basis for rejecting her opinion. Furthermore, Dr. Staskavich's assessment included the following objective findings[12]: depressed mood, feelings of worthlessness, difficultly concentrating, tearfulness, irritability, withdrawal,

---

[12]Objective medical evidence consists of medical signs and laboratory findings as defined in 20 C.F.R. § 404.1528(b) and (c).  *See* 20 C.F.R. § 404.1512(b)(1).  "Signs" are defined as "anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception.  They must also be shown by observable facts that can be medically described and evaluated." 20 C.F.R. § 404.1528(b).

and suicidal ideation. (Tr. 444). In any event, the ALJ did not cite to the reasons now advanced by the Commissioner and relied instead upon the incorrect factual assertions that Dr. Staskavich was not a licensed psychologist and that her findings were based on plaintiff's physical limitations. It is the duty of the ALJ, and not the Court, to weigh the medical evidence of record. Because the ALJ relied on factually inaccurate reasons for his decision to give little weight to Dr. Staskavich's opinion, his decision is not supported by substantial evidence.

For these reasons, the Court determines the ALJ failed to properly weigh the opinion evidence, thereby requiring a reversal and remand of this matter for further proceedings. *See Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009).

## II. Plaintiff's credibility

Plaintiff's second assignment of error asserts that the ALJ erred in evaluating plaintiff's pain and credibility with respect to her atrial septum defect and chronic persistent dyspnea in accordance with Social Security Ruling 96-7p. It is the province of the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant. *Rogers,* 486 F.3d at 247 (citations omitted). In light of the Commissioner's opportunity to observe the individual's demeanor, the Commissioner's credibility finding is entitled to deference and should not be discarded lightly. *Buxton,* 246 F.3d at 773. "If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky,* 35 F.3d at 1036. The ALJ's articulation of reasons for crediting or rejecting a claimant's testimony must be explicit and "is absolutely essential for meaningful appellate review." *Hurst,* 753 F.2d at 519. In this regard, Social Security Ruling 96-7p explains:

31

> In determining the credibility of the individual's statements, the
> adjudicator must consider the entire case record, including the objective
> medical evidence, the individual's own statements about symptoms,
> statements and other information provided by treating or examining
> physicians or psychologists and other persons about the symptoms and
> how they affect the individual, and any other relevant evidence in the
> case record.  An individual's statements about the intensity and
> persistence of pain or other symptoms or about the effect the symptoms
> have on his or her ability to work may not be disregarded solely because
> they are not substantiated by objective medical evidence.

SSR 96-7p.

In addition, the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id*.  The ALJ's credibility decision must also include consideration of the following factors:  1) the individual's daily activities; 2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; 3) factors that precipitate and aggravate the symptoms; 4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* 20 C.F.R. §§ 404.1529(c) and 416.929(c); SSR 96-7p.

32

Here, the ALJ recited the requisite factors in SSR 96-7p and found plaintiff's subjective complaints were not credible to the extent they are inconsistent with the ALJ's RFC assessment. (Tr. 31). The ALJ found that plaintiff's daily activities were consistent with light level work. The ALJ also noted inconsistencies between plaintiff's hearing testimony and other record evidence relating to her alcohol consumption. (Tr. 31). Notably, plaintiff testified at the hearing that she last drank alcohol three or four years ago; however, evaluating psychologist Adrienne Smith noted that plaintiff "would benefit from reducing her alcohol intake, . . . and it is unclear at present if she will need treatment to do so." (Tr. 414). The ALJ further indicated plaintiff's testimony relating to her sedentary life style is considered a matter of choice and not a result of her impairments. The ALJ also noted that plaintiff's most recent treatment records reveal periodic and conservative measures and the record does not indicate any side-effects from plaintiff's medication. (Tr. 31). Upon consideration of this evidence, the ALJ concluded that plaintiff's allegations lack credibility to the extent that they purport to establish a condition of disability within the meaning of the Social Security Act and Regulations. (Tr. 31).

Plaintiff contends that the ALJ's credibility finding failed to consider her numerous emergency room visits breathing problems and chest pain, as well as her lengthy treatment history with Dr. Kaiser and Dr. Kirila, which support her complaints of shortness of breath. Plaintiff also argues the ALJ failed to consider that scoliosis of the thoracic spine was well-documented in the radiology reports and clinical examinations and resulted in a chest wall deformity that likely resulted in pain and difficulty breathing. While the ALJ properly addressed several of the factors outlined in 96-7p in assessing plaintiff's credibility, namely plaintiff's daily activities, the effects of plaintiff's medication, and plaintiff's recent conservative treatment, it is

33

unclear from the ALJ's decision whether he properly considered the evidence of plaintiff's fifteen emergency room visits for shortness of breath and chest pains, pulmonary function testing, physical examination findings, and radiology reports. The ALJ's credibility analysis at Tr. 31 simply does not address the consistency of plaintiff's complaints with this evidence. In light of the ALJ's failure to properly consider and evaluate the medical and opinion evidence discussed above, including Dr. Kirila's and Dr. Staskavich's assessments, the undersigned agrees that the ALJ's credibility determination is not supported by substantial evidence. The ALJ's decision does not reflect a consideration of this objective and clinical evidence which supports plaintiff's testimony relating to her cardiac and respiratory problems in accordance with SSR 96-7p. Although the ALJ was not bound to accept plaintiff's statements about her profound shortness of breath and chest pain, he was obligated to follow the Social Security Rules and Regulations and the law of this Circuit in assessing plaintiff's credibility. He failed to do so in this case. Plaintiff's second assignment of error should be sustained.

### III. The ALJ's hypothetical question

Plaintiff's final assignment of error asserts that the ALJ's Step 5 finding is without substantial evidentiary support in the record. Plaintiff contends the ALJ's hypothetical question to the vocational expert failed to consider the limitations found by Dr. Kirila and Dr. Whalen that plaintiff was not capable of performing even sedentary work.

At Step 5 of the sequential evaluation process, the burden shifts to the Commissioner "to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step four) and vocational profile." *Jones v. Commissioner of Social Sec.,* 336 F.3d 469, 474 (6th Cir. 2003). The Commissioner may meet his burden through

reliance on a vocation expert's testimony in response to a hypothetical question.  To constitute substantial evidence in support of the Commissioner's burden, the hypothetical question posed to the vocational expert must accurately reflect the claimant's physical and mental limitations.  *See Ealy v. Commissioner of Social Security*, 594 F.3d 504, 516 (6th Cir. 2010); *Howard v. Commissioner of Soc. Sec.,* 276 F.3d 235, 241 (6th Cir. 2002); *Varley v. Secretary of Health & Human Services*, 820 F.2d 777, 779 (6th Cir. 1987).

As detailed above, the ALJ failed to properly evaluate the medical evidence of record relating to plaintiff's mental and physical impairments in determining that plaintiff was capable of performing a range of light work.  As such, the undersigned is unable to determine if the ALJ's hypothetical question to the vocational expert accurately portrayed plaintiff's impairments.  *See White v. Commissioner of Social Sec.*, 312 Fed. Appx. 779, 789 (6th Cir. 2009) (ALJ erred in relying on answer to hypothetical question because it simply restated residual functional capacity which did not accurately portray claimant's physical and mental impairments).  Because the Court is unable to determine whether the ALJ's hypothetical question accurately portrayed plaintiff's impairments, the vocational expert's testimony in response thereto does not constitute substantial evidence that plaintiff could perform the jobs identified by the VE.  Therefore, plaintiff's third assignment of error should be sustained.

**IV.  This matter should be reversed and remanded for further proceedings.**

This matter should be reversed and remanded pursuant to Sentence Four of § 405(g) for further proceedings consistent with this Report and Recommendation.  All essential factual issues have not been resolved in this matter, nor does the current record adequately establish plaintiff's entitlement to benefits as of her alleged onset date. *Faucher,* 17 F.3d at 176.  This

matter should be remanded to the Commissioner for reconsideration of plaintiff's RFC, credibility, and the weight to afford the opinions of plaintiff's treating physicians and Dr. Staskavich, and to obtain additional vocational evidence as warranted. In addition, it is recommended that the ALJ appoint a medical expert to assist the ALJ in the remand of this matter.

## IT IS THEREFORE RECOMMENDED THAT:

This case be REVERSED and REMANDED for further proceedings pursuant to Sentence Four of 42 U.S.C. § 405(g).

Date: _8/23/2011_

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

SHAOMESHA SHACKELFORD,
     Plaintiff

    vs

COMMISSIONER OF
SOCIAL SECURITY,
     Defendant

Case No. 1:10-cv-604
Dlott, J.
Litkovitz, M.J.

**NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations.  This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Am,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).

37